# United States Court of Appeals
## For the First Circuit

No. 12-1144

JAVED IQBAL KHATTAK; NAHEED ALAM KHATTAK;
FATIMA JAVED; SHAHBAZ KHAN,

Petitioners,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

William P. Joyce and Joyce & Associates, P.C. on brief
for petitioners.
Sunah Lee, Office of Immigration Litigation, Department
of Justice, Stuart F. Delery, Acting Assistant Attorney General,
Civil Division, and Cindy S. Ferrier, Assistant Director, on brief
for respondent.

January 17, 2013

**LYNCH**, **Chief Judge**.  Javed Iqbal Khattak, along with his wife Naheed Alam Khattak and their children Fatima Javed and Shahbaz Khan, all natives and citizens of Pakistan, petition for review of a decision of the Board of Immigration Appeals (BIA) affirming an immigration judge's (IJ) denial of their joint application for asylum.[1]

Javed Iqbal Khattak, age 52 (hereinafter "Khattak"), was born in the Nowshera District in Pakistan's Northwest Frontier Province, now known as the Khyber Pakhtunkhwa province.  Until 2009, Khattak and his family lived in Narri, a village outside the Nowshera District's principal city (which is also named Nowshera).  Khattak owned a marble business in Nowshera; his wife Naheed worked as a schoolteacher in Narri; and the family owned agricultural land nearby on which they raised vegetables, wheat, and sugarcane for additional income.  Khattak also owned (and continues to own) a house in Pakistan's capital, Islamabad, which he rents out; according to his and his wife's testimony, Khattak acquired the house in 1991 but lived in Islamabad only briefly before returning to Nowshera when his father became ill.

Khattak is an active member of the Awami National Party ("ANP"), which he describes as a "secular alternative" to the

---

[1] The Khattaks initially also sought statutory withholding of removal, see 8 U.S.C. § 1231(b)(3), and relief under the Convention Against Torture, but they do not continue to pursue those claims in this petition for review.

Taliban. According to his testimony in immigration court as well as documentary materials that he appended to his asylum application, Khattak has been a member of the ANP for approximately 20 years and was the president of the local ANP chapter for about 15 years. He also served as Mayor of Khairabad, a municipality of 20,000 people that evidently includes the village of Narri, from 1980 to 1991.[2]

More recently, Khattak served as vice president of the Pakistan International Human Rights Organization and, starting in August 2008, as a member of the Nowshera Peace Committee. That month, he began working for the Peace Committee as a volunteer "special police officer"; his task was to "tell people and advise people that the fight that the Taliban are fighting . . . [is] not [a] fight of Islam." He spread this message at the local mosque and at "hujras," or social spaces. Khattak stated that volunteer special police officers like himself are authorized to carry weapons, as he did, but that he never had to use his weapon in self-defense.

---

[2] According to an asylum officer's notes, Khattak said in his initial asylum interview that he served as mayor of Khairabad from 1985 to 1995. The IJ noted the apparent "inconsistency" in the dates of Khattak's term, although as discussed below, see infra note 3, the inconsistency may be attributable to translation difficulties at the asylum interview. In any event, Khattak has provided extensive documentary evidence of his involvement in local politics and anti-Taliban activism over a period of some length, including a sworn statement from Khairabad's current mayor confirming that Khattak held that office from 1980 to 1991.

In March or April of 2009, according to affidavits by Khattak and his wife Naheed, an anonymous caller placed two telephone calls to the family's home within the span of three days. Naheed answered the phone on both occasions. The first time, the caller asked for Khattak, and when Naheed said that her husband was not home, the caller hung up. The second time, the caller asked Naheed who she was, and when she identified herself as Khattak's wife, the caller told her to tell Khattak that he should "stop his activities against the Taliban because they know everything and it will be very bad for [him] and [his] family."[3]

Khattak also stated in his affidavit that "[a]fter the phone calls, the Taliban began sending threatening letters to the schools that [his] children attended," and that "[t]he principal of

---

[3] According to the asylum officer's notes, Khattak said in his initial interview that he personally received another telephone call in April 2009 from a person who identified himself as a Taliban representative and that this caller told Khattak, "We will behead you." In immigration court, Khattak denied ever telling the asylum officer that he personally received such a threat. Khattak testified that he had trouble communicating through the Pashto translator assigned to his asylum interview; he said he felt more "comfortable" with the Urdu translator assigned to his immigration court hearing, even though Pashto is Khattak's first language and Urdu is his second. The IJ said that the inconsistency between the asylum officer's notes and Khattak's testimony was "somewhat concerning" but that she was "not going to hold this inconsistency against [Khattak]."

Moreover, our case law makes clear that "immigration judges must be sensitive to the complexities of receiving testimony through a translator and take into account these difficulties when assessing credibility." Heng v. Gonzales, 493 F.3d 46, 49 (1st Cir. 2007) (quoting Giday v. Gonzales, 434 F.3d 543, 549 n.2 (7th Cir. 2006)).

-4-

[his] daughter's school asked that [he and his wife] start sending [their] daughter to school wearing a burka to avoid any problems." Khattak's wife offered a similar account in her affidavit.[4]

The threatening calls to the family's home coincided with a series of attacks against ANP members across Pakistan. In early 2009, approximately 100 political activists -- including ANP members as well as members of three other parties -- were killed in Karachi during interparty clashes. In February 2009, an ANP member of the provincial assembly was killed by a remote-control bomb in Peshawar, the capital of the Khyber Pakhtunkhwa province. The following month, a senior ANP leader in that province narrowly escaped an assassination attempt, but four other people were killed in the incident. Khattak also testified that fellow Peace Committee members received similar threats in the weeks before the two anonymous calls to his home.

At some point during the spring of 2009, Khattak decided to leave Pakistan with his family and seek refuge in the United States.[5] On July 4, 2009, Khattak, his wife, and their two younger

---

[4] Khattak and his wife were not asked about these threatening letters during their testimony before the IJ. Although Khattak makes no mention of these threatening letters in either the brief he submitted to the BIA or the briefs he filed in this court, neither does the government challenge this aspect of Khattak's and his wife's accounts.

[5] According to the asylum officer's notes, Khattak said in his initial interview that he "was hiding in [his] house" from April to July 2009. The IJ noted that Khattak's "testimony that he had gone into hiding at some point . . . appears nowhere else" in the

-5-

children entered the United States on B-2 visitor visas. (The oldest of their three children, a son, is currently a student in England and did not accompany the family to the United States.) On November 28, 2009, Khattak, his wife, and their two younger children filed applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). Khattak's wife and children concede that they have presented no independent basis for removal and that their applications are dependent upon Khattak's. See 8 C.F.R. § 208.21(a) (admission of asylee's spouse and children); see also id. § 208.14(f) (denial of principal applicant's asylum claim also results in denial of asylum for dependents who have not submitted independent application).

Taliban attacks against ANP activists have continued since Khattak and his family left Pakistan. In December 2009, an ANP provincial assembly member was killed in a suicide bombing in Swat, a district in the Khyber Pakhtunkhwa province north of Nowshera. According to a State Department report, "dozens" of ANP activists were targeted for assassination across the province

---

record; the IJ said that this fact was "troubling" and that due to her "doubt" about Khattak's credibility, "some greater degree of corroboration would be required in areas where the court has some doubts about the accuracy of the testimony." However, the IJ did not describe the type of corroborative evidence that would be required, nor did she make an explicit adverse credibility determination, and thus Khattak enjoyed a rebuttable presumption of credibility on his appeal to the BIA. See 8 U.S.C. § 208(b)(1)(B)(iii); Kho v. Keisler, 505 F.3d 50, 56 (1st Cir. 2007).

throughout 2009.  U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor, 2009 Country Reports on Human Rights Practices: Pakistan (2010).  In April 2010, at least 43 people were killed in a suicide attack targeting an ANP rally in the Lower Dir district, which is west of Swat and also in Khyber Pakhtunkhwa.  In May 2011, the ANP president was killed in Swat, and the State Department notes that ANP elected officials and their families remain "major targets of attack" in Khyber Pakhtunkhwa.  See U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor, Country Reports on Human Rights Practices for 2011: Pakistan 4, 22 (2012); see also U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor, 2010 Country Reports on Human Rights Practices: Pakistan 9, 30, 32-33 (2011).

Meanwhile, the Department of Homeland Security initiated removal proceedings against Khattak and his family members in March 2010.  On May 24, 2010, an immigration judge in Boston denied Khattak's and his family members' applications for asylum, withholding of removal and CAT relief and ordered them removed to Pakistan; the Board of Immigration Appeals affirmed the IJ's order on December 27, 2011; and the Khattaks filed a timely petition for review in this court.

Although "[o]rdinarily, we review the decision of the BIA and not that of the IJ," we examine the IJ's decision "to the extent that the BIA deferred to or adopted the IJ's reasoning."

Hasan v. Holder, 673 F.3d 26, 33 (1st Cir. 2012) (quoting Bonilla v. Mukasey, 539 F.3d 72, 76 (1st Cir. 2008)) (alteration and internal quotation marks omitted). On issues of fact, we "apply the 'substantial evidence' standard and defer to those findings of fact that are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Perlera-Sola v. Holder, 699 F.3d 572, 576 (1st Cir. 2012) (quoting Lobo v. Holder, 684 F.3d 11, 16 (1st Cir. 2012)). On questions of law, our review is de novo but "with appropriate deference to the agency's interpretation of the underlying statute in accordance with administrative law principles." Vásquez v. Holder, 635 F.3d 563, 565 (1st Cir. 2011) (quoting Stroni v. Gonzales, 454 F.3d 82, 87 (1st Cir. 2006)) (internal quotation marks omitted).

An asylum applicant bears the burden of showing that he is unable to return to his country of nationality either due to past persecution or "a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Perlera-Sola, 699 F.3d at 576 (quoting 8 U.S.C. § 1101(a)(42)(A)) (internal quotation marks omitted); see also 8 U.S.C. § 1158(b)(1)(B)(i) (asylum applicant bears burden of proof). The applicant also must show that the harm he has experienced or reasonably fears he will experience bears "some connection to government action or inaction," Perlera-Sola, 699 F.3d at 576 (quoting Harutyunyan v. Gonzales, 421 F.3d 64, 68

-8-

(1st Cir. 2005)) (internal quotation mark omitted). This "link may be forged . . . by evidence of an inability on the part of the government to prevent the acts" that have caused or will cause harm to the applicant. Harutyunyan, 421 F.3d at 68; see also Castillo-Diaz v. Holder, 562 F.3d 23, 27 (1st Cir. 2009).

Where the applicant seeks asylum based on a well-founded fear of future persecution, he must show that he has "a subjective fear of future persecution" and that his fear is "objectively reasonable." Barsoum v. Holder, 617 F.3d 73, 79 (1st Cir. 2010). To meet this latter requirement, the applicant must either (1) "provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution" or (2) "establish[] that there is a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant." 8 C.F.R. § 208.13(b)(2)(C)(iii); see also Sugiarto v. Holder, 586 F.3d 90, 97 (1st Cir. 2009). An applicant who seeks asylum based on a pattern-or-practice claim must show "systematic or pervasive persecution of a particular group based on a protected ground, rather than generalized civil conflict or a pattern of discrimination." Díaz-García v. Holder, 609 F.3d 21, 29 (1st Cir. 2010) (quoting Sugiarto, 586 F.3d at 97) (internal quotation marks omitted).

Even where an applicant shows an objectively reasonable fear of persecution, the asylum claim may be denied if the adjudicator finds that the applicant could avoid future persecution by relocating to another part of his country of nationality and that "under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(2)(C)(ii); see also Castillo-Diaz, 562 F.3d at 28 & n.4. Where the asylum applicant proves past persecution or shows a well-founded fear of future state-sponsored persecution, the applicant can rely on a (rebuttable) presumption that internal relocation would not be reasonable. 8 C.F.R. § 208.13(b)(3)(ii). By contrast, in cases such as this one where the asylum claim is based on fear of future persecution by non-state actors (albeit non-state actors that the government allegedly cannot control), the applicant bears the burden of showing that relocation would be unreasonable. Id. § 208.13(b)(3)(i).

Before reaching a finding regarding the reasonableness of relocation, however, the adjudicator should consider a number of factors specified in the relevant regulation, including "whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R.

-10-

§ 208.13(b)(3). And the denial of an asylum claim cannot rest on the possibility of internal relocation where "[n]either the IJ, nor the BIA, explained how it would be possible for [the applicant] to safely relocate" within his country of nationality. Oryakhil v. Mukasey, 528 F.3d 993, 998 (7th Cir. 2008); see also Seck v. U.S. Att'y Gen., 663 F.3d 1356, 1367 (11th Cir. 2011) (case remanded where BIA "ignored substantial evidence" indicating that internal relocation was unreasonable).

At this stage, Khattak argues that he has a well-founded fear of future persecution based on his anti-Taliban political opinions and ANP activism; he does not continue to press the argument that he suffered past persecution, nor does he continue to pursue asylum based on membership in a particular social group. The IJ acknowledged that Khattak has a "subjectively genuine fear of returning to Pakistan" but held that Khattak did not show his fear was objectively reasonable.

In explaining the reasons for her decision, the IJ said that Khattak appeared to have been targeted due to his work as a special police officer with the local peace committee, not due to his ANP activism. The IJ noted that Khattak had been active in the ANP for approximately 20 years and that the Taliban threats only began after he joined the local peace committee.[6] The IJ seemed to

---

[6] Of course, the fact that the Taliban did not target Khattak through most of his first two decades in the ANP may simply indicate that the emergence of the Taliban as a threat in Pakistan

-11-

believe that persecution on the basis of Khattak's "special police officer" status would not qualify as persecution on the basis of political opinion. Cf. Matter of Fuentes, 19 I. & N. Dec. 658, 661 (B.I.A. 1988) ("[D]angers faced by policemen as a result of that status alone are not ones faced on account of race, religion, nationality, membership in a particular social group, or political opinion."). The IJ also said that Khattak had not established the requisite connection to the Pakistani government because the government "was in fact taking on the Taliban" and "mak[ing] inroads." Finally, the IJ said that even if Khattak would be subject to persecution in the Khyber Pakhtunkhwa province, he and his family could safely relocate to Islamabad.

The BIA affirmed the IJ's decision, specifically stating that:

> - Khattak had not shown that he and his family would be "singled out for harm rising to the level of persecution" if they returned to Pakistan;
>
> - Khattak had not demonstrated that there is a "pattern or practice" in Pakistan of targeting anti-Taliban political leaders;
>
> - Khattak had not shown that the Pakistani government is unwilling or unable to control the Taliban, and the record reveals that the Pakistani government "has taken military action" against Taliban forces; and

---

is relatively recent. See, e.g., Khan v. Att'y Gen. of the U.S., 691 F.3d 488, 495-96 (3d Cir. 2012) (percentage of Pakistanis who believe that Taliban and other religious militants pose "critical threat" rose from 34% in 2007 to 81% in 2009).

- Khattak has not shown that internal relocation to Islamabad would be unreasonable.

With regard to Khattak's claim that he would be "singled out" for harm on the basis of his political opinion,[7] the BIA offered no analysis of its own, stating only that the IJ "properly determined that [Khattak] has not met his burden."  The IJ's finding that Khattak would not be "singled out" on the basis of political opinion was premised on her belief that, under Matter of Fuentes, 19 I. & N. Dec. 658, an applicant is not eligible for asylum if he is targeted due to his activities as a police officer.

This interpretation of Matter of Fuentes was squarely rejected in Castañeda-Castillo v. Holder, 638 F.3d 354 (1st Cir. 2011), which we decided ten months after the IJ's order in Khattak's case but nine months before the BIA dismissed Khattak's appeal.  Matter of Fuentes held only that police officers do not

---

[7] The government argues that Khattak has waived the argument that he and his family will be singled out for harm.  It is true that Khattak's brief on appeal focuses on his pattern-or-practice claim rather than his claim that he will be singled out for harm; however, Khattak's brief also states that he was specifically targeted by the Taliban on account of his political activities, and he emphasizes that he is a "highly visible figure in his home province" rather than a rank-and-file member of the ANP.  This in substance amounts to an argument that he will be singled out for attack from among the ANP membership on account of his prominence.  Accordingly, we cannot say that Khattak has waived his singling-out argument.  Cf. Haxhiu v. Mukasey, 519 F.3d 685, 691 (7th Cir. 2008) (asylum-seeker challenging BIA's decision does not waive argument insofar as appellate court "can identify an articulable basis for error in his brief").

-13-

suffer "persecution" within the meaning of the asylum statute when they are "attacked . . . because they are (or are viewed as) extensions of the government's military forces or simply because they are highly visible embodiments of the power of the state." 19 I. & N. Dec. at 661. But Matter of Fuentes did not hold that a police officer is ineligible for asylum if he is targeted due to the political views that he has expressed on the job or off. See Castañeda-Castillo, 638 F.3d at 365 ("[T]he sheer fact of being on active duty is not dispositive under Fuentes . . . ."); see also Recinos-Castillo v. Holder, 444 F. App'x 459, 462 (1st Cir. 2011) (eligibility for asylum can be based on "persecution that targeted an applicant personally 'even if originating out of actions undertaken' while serving in a law-enforcement capacity" (quoting Castañeda-Castillo, 638 F.3d at 365)); Cruz-Navarro v. INS, 232 F.3d 1024, 1029 (9th Cir. 2000) ("Fuentes . . . does not flatly preclude 'police officers . . . from establishing claims of persecution or fear of persecution'" (quoting Velarde v. INS, 140 F.3d 1305, 1311 (9th Cir. 1998))).

Matter of Fuentes also did not address situations in which individuals may be labeled as "police officers" but perform non-traditional police functions. See Castañeda-Castillo, 638 F.3d at 364 (the "underlying concern in Fuentes was that police officers . . . cannot be eligible for asylum simply because they were exposed to assault in the line of duty," as "[t]hat is, after

-14-

all, part of their job").  Here, while Khattak was technically a "special police officer," his primary duty on behalf of the Peace Committee was to persuade people to spurn the Taliban, which is not a standard law-enforcement function.  See Shah v. Holder, 433 F. App'x 603, 605 (9th Cir. 2011) (Fuentes does not apply to Nepalese police officer who "instructed villagers on human rights and antiterrorism concepts" because "[u]nlike a traditional police officer," he was targeted "not merely as an enforcer of the government's laws, but as an active political opponent" of the Maoists); Grava v. INS, 205 F.3d 1177, 1181 (9th Cir. 2000) (Fuentes does not disqualify asylum applicant who "does not fear the usual job hazards of a law enforcement officer," but fears persecution on account of his political opinion).  Thus, the IJ not only misconstrued the holding in Matter of Fuentes, but the holding in Matter of Fuentes does not even appear to apply to Khattak's case.

Furthermore, in addition to his status as a "special police officer," Khattak was particularly prominent in his hometown as a member of the Peace Committee, a leader of a national human rights organization, a longtime ANP activist and a former mayor. If Khattak's activities in one or more of these roles contributed to the Taliban's decision to target him, then "the persecution the applicant fears is not a result simply of h[is] status as a . . . police officer, but rather is a result occasioned by other factors

-15-

more specific to the particular applicant." Koudriachova v. Gonzales, 490 F.3d 255, 261-62 (2d Cir. 2007); see also Konan v. Att'y Gen. of the U.S., 432 F.3d 497, 504 (3d Cir. 2005) (distinguishing between police officers who are attacked "because they are police officers" and police officers who are attacked "because they are loyalists").

To its credit, the BIA correctly cited Castañeda-Castillo and acknowledged that Khattak's status as a special police officer was not necessarily a bar to his asylum claim. But the Board went on to say no more than that "[t]he Immigration Judge properly determined that the lead respondent has not met his burden." Despite the deference we give to the BIA's factual findings, we do not defer to "cursory, summary or conclusory statements from the Board." Aponte v. Holder, 610 F.3d 1, 4 (1st Cir. 2010) (quoting Onwuamaegbu v. Gonzales, 470 F.3d 405, 412 (1st Cir. 2006)) (internal quotation mark omitted). Here, the IJ's only explanation for concluding that Khattak's fear of future persecution was not well-founded -- apart from the issues of government protection and internal relocation addressed below -- was that the Taliban had targeted Khattak due to his work as a special police officer rather than as an ANP leader. Yet even if that is true, it does not disqualify Khattak from establishing eligibility for asylum.

The IJ also did not offer any analysis of Khattak's pattern-or-practice claim, and the BIA added nothing more on this

-16-

issue beyond the statement that Khattak had failed to meet the standard for asylum based on a pattern or practice of persecution against persons similarly situated to the applicant. Cf. Rasiah v. Holder, 589 F.3d 1, 5 (1st Cir. 2009) ("[T]he standard is demanding and in substance requires a showing of regular and widespread persecution creating a reasonable likelihood of persecution of all persons in the group."). In light of our decision to send this case back to the BIA so that the Board can fully consider Khattak's claim that he will be singled out for persecution, we need not reach the pattern-or-practice question at this juncture. See Avetova-Elisseva v. INS, 213 F.3d 1192, 1201 (9th Cir. 2000) (regulation regarding eligibility for asylum "brings the 'pattern or practice' requirement into play only as an alternative to an applicant's showing 'that he or she would be singled out individually for persecution'" (quoting 8 C.F.R. § 208.13(b)(2))). And where factual findings regarding a pattern-or-practice claim are insufficient, "the better course is for us to remand th[e] petition to the BIA rather than attempt to adjudicate [the pattern-or-practice] claim ourselves," as "[t]he potential costs of a wrong decision on a pattern or practice claim are considerable." Mufied v. Mukasey, 508 F.3d 88, 93 (2d Cir. 2007); see also Ahmed v. Gonzales, 467 F.3d 669, 675 (7th Cir. 2006) ("[O]nce the court finds that a group was subject to a pattern or practice of persecution, every member of the group is eligible for asylum.").

-17-

We must, however, address the IJ's finding -- affirmed by the BIA -- that Khattak has not met his burden of showing that the Pakistani government is unable to protect him from Taliban attacks, as Khattak cannot prevail on either his singling-out claim or his pattern-or-practice claim unless he establishes "some connection to government action or inaction," Perlera-Sola, 699 F.3d at 576 (quoting Harutyunyan, 421 F.3d at 68) (internal quotation mark omitted).  In support of this finding, the IJ noted that there is "a war going on involving the Taliban," which she took to mean that the Pakistani government is "in fact taking on the Taliban"; she added that "the government continues to make inroads against the Taliban," but she did not go on to explain what these "inroads" were.

Yet although such military action indicates that the Pakistani government is willing to take on the Taliban, such action does not show that the Pakistani government is able to protect its citizens from Taliban attacks.  See Rehman v. Att'y Gen. of the U.S., 178 F. App'x 126, 129 (3d Cir. 2006) (IJ's finding that the Pakistani government "has been attempting to address [the terrorist] situation" does not establish that Pakistani government can control terrorist groups (alteration in original) (internal quotation marks omitted)); see also Lolong v. Gonzales, 400 F.3d 1215, 1224-25 (9th Cir. 2005) ("[E]vidence of the government's willingness to control the perpetrators of ethnic and religious

-18-

violence in Indonesia fails to rebut the overwhelming evidence of the government's _inability_ to control those forces.").

The BIA added little to the IJ's analysis beyond the statement that Khattak "did not present any corroborative evidence to demonstrate that the government of Pakistan is unable or unwilling to protect him and his family from threats or harm by the Taliban."  But in fact Khattak did provide an affidavit signed by 50 people from the Nowshera District attesting that they had "advised [Khattak] to leave the country for the safety and protection of his life" -- which goes toward corroborating Khattak's claim that he would not remain safe if he stayed in his home region (even if the affidavit does not go all the way to proving that claim).  Since the BIA's statement that Khattak "did not present any corroborative evidence" is clearly contradicted by the record, we need not reach the question of whether Khattak was entitled to notice of the need for corroborative evidence and, if so, whether such notice was given.  See Guta-Tolossa v. Holder, 674 F.3d 57, 62-65 (1st Cir. 2012) (reserving judgment on these questions so that BIA may address them in the first instance).

Finally, with regard to the reasonableness of internal relocation, the BIA correctly concluded that Khattak bore the burden of proving that relocation would not be reasonable; it also appropriately noted that Khattak owns a home in Islamabad.  The fact that an asylum applicant or an asylum applicant's family

-19-

member owns a home in another part of the country may support a finding that internal relocation is reasonable. See, e.g., Wasef v. Holder, 387 F. App'x 521, 529 (6th Cir. 2010). The fact that the Khattaks actually lived in Islamabad for a time may also support a finding that they could relocate to the capital, although it is worth noting that the Khattaks' brief stay in Islamabad occurred more than two decades ago. Cf. Oryakhil, 528 F.3d at 1000 (fact that asylum applicant lived in northern Afghanistan from 1992 to 1994 does not mean that relocation there would be safe one-and-a-half decades later). And most importantly, the possibility of internal relocation will only defeat an asylum claim where the applicant could also "avoid [future] persecution by relocating." 8 C.F.R. § 208.13(b)(2)(C)(ii); see Cendrawasih v. Holder, 571 F.3d 128, 131 (1st Cir. 2009).

Here, neither the IJ nor the BIA addressed evidence in the record indicating that the Taliban's reach may extend as far as Islamabad. And the State Department's country report for 2009 indicates that ANP activists have been victims of targeted killings even outside the Khyber Pakhtunkhwa province. See U.S. Dep't of State, 2009 Country Reports on Human Rights Practices: Pakistan, supra (noting that "[t]here were 256 targeted killings in Karachi alone," and "[t]hose killed included . . . 23 from the ANP and other political parties").

Moreover, while the relevant regulation sets out a (nonexhaustive) list of factors for adjudicators to consider when determining the reasonableness of internal relocation, 8 C.F.R. § 208.13(b)(3), neither the IJ nor the BIA made any mention of those factors. And while the IJ and BIA do not necessarily have to address each of the reasonableness factors explicitly, see 8 C.F.R. § 208.13(b)(3) (noting that "factors may, or may not, be relevant, depending on all the circumstances of the case"), the agency must explain why the factors that cut against the asylum applicant outweigh the factors in his favor. See, e.g., Kartasheva v. Holder, 582 F.3d 96, 105 (1st Cir. 2009) ("[W]e may not affirm the BIA's decision 'when [we] cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" (quoting Gailius v. INS, 147 F.3d 34, 44 (1st Cir. 1998)) (second alteration in original)); see also Aponte, 610 F.3d at 5 ("[W]e 'may not assume that the Board considered factors that it failed to mention in its opinion.'" (quoting Daneshvar v. Ashcroft, 355 F.3d 615, 626 (6th Cir. 2004))).

Importantly, nothing that we have said so far should be interpreted as holding that Khattak necessarily has met his burden of showing eligibility for asylum. The BIA said that Khattak did not meet his burden (albeit without explaining why), and "[t]o

-21-

reverse the BIA finding we must find that the evidence not only supports [a contrary] conclusion, but compels it." INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1 (1992); accord Jamal v. Mukasey, 531 F.3d 60, 66 (1st Cir. 2008).

Elias-Zacarias sets a high bar for reversal (as distinguished from remand) in asylum cases, and we do not here hold that the evidence in support of Khattak's claim is so overwhelming as to meet that bar. For one thing, Khattak testified that friends of his received similar threats in the weeks before the anonymous phone calls to his home, but it is not clear how many of these friends who received such threats ultimately suffered harm at the hands of the Taliban. Cf. Gilca v. Holder, 680 F.3d 109, 115 (1st Cir. 2012) (substantial evidence supported IJ's finding that "vague threats addressed to the petitioner, virtually all of which were conveyed over the telephone by unknown persons, were nothing more than empty words"). And while the record makes clear that the Taliban have specifically targeted high-ranking members of the ANP (including the president of the party, members of the provincial assembly in Khattak's province, and a senior minister in the provincial government), Khattak is not himself an assembly member or a senior minister.

Meanwhile, the government has pointed us toward portions of the record that, it says, would allow us to conclude that the Pakistani government can protect Khattak and that the Taliban's

-22-

reach may <u>not</u> extend as far as Islamabad.  But as we have emphasized, "[a] reviewing court should judge the action of [the BIA] based only on reasoning provided by the agency, not based on grounds constructed by the reviewing court."  <u>Mihaylov</u> v. <u>Ashcroft</u>, 379 F.3d 15, 21 (1st Cir. 2004) (second alteration in original) (quoting <u>Yatskin</u> v. <u>INS</u>, 255 F.3d 5, 9 (1st Cir. 2001)) (internal quotation marks omitted).

In sum, while we will not <u>reverse</u> the BIA's findings where the evidence at least admits the possibility of a conclusion in accord with the BIA's, "we will remand if the agency fails to state 'with sufficient particularity and clarity the reasons for denial of asylum' or otherwise to 'offer legally sufficient reasons for its decision.'"  <u>Mihaylov</u>, 379 F.3d at 21 (quoting <u>Gailius</u>, 147 F.3d at 46-47); <u>see</u> <u>also</u> <u>Jalloh</u> v. <u>Ashcroft</u>, 103 F. App'x 402, 406-07 (1st Cir. 2004) (distinguishing between standard for reversal and standard for remand).  Here, we are not satisfied that either the IJ or the BIA has "present[ed] a reasoned analysis of the evidence as a whole."  <u>Jabri</u> v. <u>Holder</u>, 675 F.3d 20, 24 (1st Cir. 2012).  Accordingly, the petition for review is <u>granted</u>; the order of the BIA is <u>vacated</u>; and the case is <u>remanded</u> for further proceedings consistent with this opinion.