# United States Court of Appeals

## For the First Circuit

No. 15-2272

FELIPE GARCÍA-CRUZ,

Petitioner,

v.

JEFFERSON B. SESSIONS III,[*]
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Randy Olen, for petitioner.
Lindsay M. Murphy, Trial Attorney, Office of Immigration
Litigation, Civil Division, U.S. Department of Justice, with whom
Benjamin C. Mizer, Principal Deputy Assistant Attorney General,
Civil Division, and Andrew N. O'Malley, Senior Litigation Counsel,
were on brief, for respondent.

May 26, 2017

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General
Jefferson B. Sessions III is substituted for former Attorney
General Loretta E. Lynch, as respondent.

**TORRUELLA**, **Circuit Judge**.  Petitioner Felipe García-Cruz appeals from a Board of Immigration Appeals ("BIA") decision, which affirmed an Immigration Judge's ("IJ") decision denying his applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  García-Cruz argues that he presented sufficient evidence to establish both past persecution and a well-founded fear of future persecution, and that he could not reasonably relocate within Guatemala, the country of removal.

## BACKGROUND

### A.  Factual Background[1]

García-Cruz is a native of Guatemala, from the village of Chixocol, in the municipality of Zacualpa.  García-Cruz became involved in politics in June 2011, after seeing the Patriota (Spanish for "Patriot") party's mayoral candidate for Zacualpa, Gabriel Ventura, deliver a speech.  That month, he joined the Patriota party, and by August he had become a member of the party's executive committee.  As a member of the committee, he traveled to campaign events to handle set up and logistics; in his time with the party, he helped prepare three rallies.

---

[1]  The IJ found García-Cruz's testimony credible, and the BIA did not make a contrary finding.  We therefore summarize the facts as presented by García-Cruz in his testimony and affidavit.

The incumbent mayor, Ernesto Calachij-Riz, belonged to the Une y Gana (Spanish for "Unite and Win") party. According to García-Cruz, in the days leading up to the elections, Une y Gana members "began to carry weapons and threaten [Patriota supporters] with their weapons. They had guns and they had sticks and machetes . . . and they knew who [Patriota supporters] were." Une y Gana members also threatened to "kill anyone who voted for Ventura." Patriota supporters were "ridiculed, sometimes even beaten by the Une y Gana party." Nevertheless, García-Cruz and his family cast their votes for Ventura on September 11, 2011.

That night, it was announced that Calachij-Riz, the Une y Gana candidate, had won the race. The next morning, Patriota members gathered at the Une y Gana victory rally, where a "huge fight broke out" and the "city hall was set on fire." García-Cruz was at home at the time, but other Patriota supporters told him that "the Une y Gana party was going to kill off all the members of the [Patriota party]." In addition, the Une y Gana party made "a list of people they accused of being responsible for the fire." García-Cruz was on the list, even though he "had nothing to do with the fire," because of his "involvement in the Patriota party."

García-Cruz received five threatening phone calls in the aftermath of the September 2011 election. The first came just days after the election, when an anonymous caller -- who identified

himself as an Une y Gana member -- blamed García-Cruz for the fire, pledged to hold him responsible for it, and threatened his life. A second anonymous caller made similar allegations and stated: "We are watching you, and when we find you we will kill you." García-Cruz became so concerned for his life that he stopped leaving his house. In the third call, the caller asked García-Cruz why he had stopped leaving the house, to which García-Cruz responded that he was frightened.

Fearing for his life, García-Cruz moved to Cobán, Alta Verapaz, Guatemala. There, he found work running games at fairs and carnivals. On October 9, 2011, while in Cobán, García-Cruz received the next phone call. The caller asked why he had left Chixocol and told García-Cruz that they knew where he was. In the fifth and final phone call, in January 2012, the caller told García-Cruz that if he did not return to Chixocol, Une y Gana would kidnap his wife and children. García-Cruz never reported the threatening phone calls to authorities. He claimed that the local police were "in the present mayor's pocket," and he feared word would get back to those threatening him if he reported the calls to the national police.

In the days after the fifth phone call, García-Cruz relocated his family to the village of Salamá, about ten hours from Chixocol. García-Cruz also removed the chip from his cell

phone so that he would not receive any more calls.  After saving enough money, García-Cruz left Guatemala for the United States in May 2012.  Nothing suggests that he was either harmed or threatened further between January and May of 2012.

The political conflict in Zacualpa resulted in other Patriota members being targeted.  García-Cruz averred that "other members of the Patriota party were being kidnapped and beaten." Two or three weeks after the election, an acquaintance of Ventura was "taken from his home and beaten very badly."  Another Patriota member was abducted by Une y Gana and only returned as part of a prisoner exchange.  García-Cruz also testified that he knew of "at least one" person who was killed by Une y Gana "in the year that [he] left."  García-Cruz does not know what happened to other members of the committee who were accused of burning the city hall, however.  In June 2012, after García-Cruz fled Guatemala, Ventura was arrested by the police for alleged crimes against his political rivals, triggering further protests.

At the time of García-Cruz's hearing, the president of Guatemala was a member of the Patriota party, but the Une y Gana party remained in control of Zacualpa.  In addition, García-Cruz's wife and children were still living in Salamá.  García-Cruz, however, could not live with them because they lived with his wife's employer, and he would not be able to find work in Salamá.

## B.  Procedural History

García-Cruz conceded removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) and applied for asylum, withholding of removal, and protection under the CAT on January 22, 2013. On May 22, 2014, the IJ held a hearing on García-Cruz's application. The IJ found his testimony to be credible, but she ruled that García-Cruz did not establish past persecution. The IJ explained that García-Cruz was never physically harmed and had worked in public view, and the phone calls alone were not "so menacing as to have caused some actual harm" and so did not rise to the level of persecution. Moreover, given García-Cruz's failure to report the calls to authorities, the IJ "could not conclude the requisite government action or inaction."

The IJ also concluded that García-Cruz's fear of future persecution was not well-founded; given the time elapsed and García-Cruz's limited involvement with the campaign, there was little support for his assertion that he would be targeted if he returned to Guatemala. Furthermore, the IJ found that, "although it would be economically difficult," García-Cruz could relocate within Guatemala because Guatemala's president at the time of the hearing was a member of the Patriota party and "the Patriota party ha[d] gained significant ground in Guatemala." Specifically, García-Cruz could "reasonabl[y]" and "safely" relocate to Salamá,

where he had relocated his wife and children.  Thus, the IJ denied García-Cruz's applications for both asylum and withholding of removal.  The IJ concluded by denying García-Cruz's application for protection under the CAT given his failure to demonstrate that he would be subjected to torture by or with the acquiescence of a public official.

On September 30, 2015, the BIA upheld the IJ's decision on two grounds.  First, it adopted the IJ's determination that the "five anonymous threatening phone calls were not so menacing as to have caused some actual harm," and so they did not rise to the level of past persecution.  Second, it found "no clear error of fact or mistake of law in the Immigration Judge's assessment" that García-Cruz "would be able to relocate to another area in Guatemala."  It cited the fact that his wife and children lived in Salamá as "strong evidence that [García-Cruz] could do so as well."  Thus, the BIA ruled that García-Cruz was not eligible for either asylum or withholding of removal.  Finally, the BIA affirmed that García-Cruz failed to establish that "he had ever been tortured or that government officials seek to torture him."[2]

---

[2]  The BIA did not adopt the IJ's findings (1) that it "could not conclude the requisite government action or inaction," or (2) that García-Cruz had not established a well-founded fear of future persecution even if he did not relocate within Guatemala.  We therefore do not review those issues. Renaut v. Lynch, 791 F.3d 163, 170-71 (1st Cir. 2015); Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004) ("[W]here the BIA's decision adopts portions of

The BIA therefore dismissed his appeal, and García-Cruz petitioned this Court for review.

## ANALYSIS

We review the BIA's findings of fact under a "substantial evidence" standard, and we will uphold them if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Xin Qiang Liu v. Lynch, 802 F.3d 69, 74 (1st Cir. 2015) (quoting Hasan v. Holder, 673 F.3d 26, 33 (1st Cir. 2012)). Questions of law are reviewed de novo. Id. Thus, we will reverse the BIA's determination only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

To be eligible for asylum, García-Cruz must establish that he is unwilling or unable to return to Guatemala "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "Proof of past persecution creates a presumption of a well-founded fear of future persecution." Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014); 8 C.F.R. § 1208.13(b)(1). But the Government can rebut this presumption by demonstrating either changed

the IJ's opinion, we review those portions of the IJ's opinion that the BIA has adopted.").

-8-

circumstances or that García-Cruz "could avoid future persecution by relocating to another part of [Guatemala] . . . and under all the circumstances, it would be reasonable to expect [him] to do so."  8 C.F.R. § 1208.13(b)(1)(i)(A)-(B).  Similarly, García-Cruz cannot establish a well-founded fear of future persecution if he "could avoid persecution by relocating to another part of [Guatemala] . . . [and] under all the circumstances it would be reasonable to expect [him] to do so." 8 C.F.R. § 1208.13(b)(2)(ii).

## A. Substantial Evidence Supported the BIA's Determination that García-Cruz Did Not Suffer Past Persecution

García-Cruz sought to demonstrate that he suffered persecution in Guatemala, in the form of death threats, on account of his political beliefs, thus creating a rebuttable presumption that he will more likely than not suffer persecution if returned to Guatemala. See 8 C.F.R. § 1208.13(b)(1).  "[C]redible, specific threats can amount to persecution if they are severe enough." Javed v. Holder, 715 F.3d 391, 395-96 (1st Cir. 2013).  "'Threats of murder' fit squarely within this rubric."  Id. at 396 (quoting López de Hincapié v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007)). "[T]he addition of physical violence" is not required for a finding of past persecution, id., but "threats standing alone constitute past persecution in only a small category of cases, and only when the threats are so menacing as to cause significant actual suffering or harm."  Bonilla v. Mukasey, 539 F.3d 72, 77 (1st Cir.

-9-

2008) (quoting Tobon-Marin v. Mukasey, 512 F.3d 28, 32 (1st Cir. 2008)).

In Bonilla, the petitioner received frequent telephone calls from a militant group threatening his and his family's lives because of his support for a presidential candidate. Id. at 74-75. After he changed his telephone number, the same group left a letter outside his apartment declaring the petitioner "a military target." Id. at 75. The BIA adopted the immigration judge's ruling that this was not past persecution. Id. at 76. We affirmed, stating that "we [could not] say that the agency was compelled to find that [the petitioner] was persecuted." Id. at 78. Similarly, in Un v. Gonzales, the petitioner was twice confronted by government agents, who told him on the second occasion that he would be killed, and a friend subsequently told him to "go into hiding because they were 'looking to kill [the petitioner].'" 415 F.3d 205, 207-08 (1st Cir. 2005). The BIA had not considered the possibility of past persecution, and we remanded for a finding because "we [could not] say the evidence compels a conclusion either way." Id. at 209.

The intensity and credibility of the threats received by García-Cruz are similar to those in Bonilla and Un. Bonilla in particular seems factually analogous, closer than cases like Javed, 715 F.3d 391, cited by García-Cruz, in which we have held

that threats constituted persecution as a matter of law.  Although the BIA certainly could have found that García-Cruz suffered past persecution on this record, given our deferential standard of review, we cannot say that it was compelled to do so.

**B.    The BIA Did Not Correctly Analyze Whether It Would Be Reasonable to Expect García-Cruz to Relocate Within Guatemala**

The BIA concluded that García-Cruz "did not establish . . . a well-founded fear of persecution."  However, it did so on only one possible ground -- by adopting the IJ's finding that García-Cruz "would be able to relocate to another area in Guatemala."

"An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(2)(ii). When determining whether such internal relocation is reasonable:

> adjudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.

8 C.F.R. § 1208.13(b)(3).

Determining whether an applicant can reasonably relocate within the applicant's country of nationality entails a two-step analysis. Matter of M-Z-M-R-, 26 I. & N. Dec. 28, 32 (2012). First, the BIA must decide whether there is a safe area of the country, i.e., one where the applicant would have no well-founded fear of persecution. Id. Second, if there is such an area, the BIA must analyze whether "it would be reasonable for the applicant to relocate," applying the considerations of 8 C.F.R. § 1208.13 (b)(3). Id. at 34-35 (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)).

## 1. Jurisdiction

Before we proceed, we must determine whether we can review all of García-Cruz's arguments. We may only review García-Cruz's claims if he "has exhausted all administrative remedies available to [him] as of right." 8 U.S.C. § 1252(d)(1). In his appeal to the BIA, García-Cruz argued only that he would not be safe if he relocated within Guatemala. He did not argue that the IJ made any error in determining that it would be reasonable for him to relocate. Before us, however, García-Cruz also argues that the IJ and the BIA did not properly apply the considerations listed in 8 C.F.R. § 1208.13(b)(3).

The Government has not raised this issue, and it appears that we have not previously addressed whether we would raise failure to exhaust sua sponte in the asylum context. But

-12-

administrative exhaustion in this context is an "inquiry into subject-matter jurisdiction," Mazariegos-Paiz v. Holder, 734 F.3d 57, 62 (1st Cir. 2013), and where a requirement is jurisdictional -- where it "affect[s] a court's constitutional or statutory power to adjudicate a case" -- a party's failure to fulfill that requirement is "nonwaivable." Bennett v. City of Holyoke, 362 F.3d 1, 7-8 (1st Cir. 2004); see also Alphas Co. v. William H. Kopke, Jr., Inc., 708 F.3d 33, 36-38 (1st Cir. 2013). We therefore hold that we may determine whether a petitioner has exhausted his or her administrative remedies as required by 8 U.S.C. § 1252(d)(1), even if no party has addressed the issue.

A petitioner generally "cannot proffer a theory to the IJ, forgo any presentation of that theory to the BIA, and then resurrect the theory on a petition for judicial review." Ramírez-Matías v. Holder, 778 F.3d 322, 327 (1st Cir. 2015). Although a party presenting an issue to the BIA is the most common way in which an issue is exhausted, however, it is not the only way. Mazariegos-Paiz, 734 F.3d at 62. Even if an issue was not raised by a party, the issue is exhausted if the BIA addresses the issue on the merits. Id. at 63 ("Where an agency has opted to [address an issue], there is no logical reason why exhaustion should turn on which party (if either) brought the issue to the agency's attention."); see also Xin Qiang Liu, 802 F.3d at 74 ("The

exhaustion requirement is satisfied where the agency chooses to address the merits of a particular issue, regardless of whether the alien raised that issue." (quoting Meng Hua Wan v. Holder, 776 F.3d 52, 56 (1st Cir. 2015)).

Here, the IJ squarely addressed the issue. It found that although "it would be economically difficult [for García-Cruz to relocate], it is reasonable to expect internal relocation rather than to come to the United States." The IJ further explained that García-Cruz's "wife and children remain in Guatemala in a town nine to [ten] hours from Chixocol" and so it would be "reasonable for [him] to relocate there" -- plus, the IJ added, "he could do so safely."

For its part, the BIA repeated how the IJ had found that García-Cruz "would be able to relocate to another area in Guatemala." The BIA then stressed that "[i]n this regard," the IJ had noted that García-Cruz's "wife and child remain in Guatemala in a town 9 or 10 hours away, strong evidence that [he] could do so as well." And the BIA found "no clear error of fact or mistake of law with the [IJ's] assessment." The BIA therefore briefly addressed the reasonableness of internal relocation on its own -- finding that his wife and children remaining in Guatemala was "strong evidence" that he could relocate -- and it adopted the IJ's more detailed reasoning on that point. Thus, we can review

-14-

both whether the BIA properly found that it was safe for García-Cruz to relocate within Guatemala -- which García-Cruz has raised at every level -- and whether the BIA properly found that he could reasonably do so -- an issue which the BIA addressed on the merits.

## 2. The Merits

Substantial evidence supports the BIA's finding that García-Cruz could safely relocate within Guatemala. As the IJ described: García-Cruz lived in Cobán from January 2012 to May 2012 without any further threats after removing the chip from his phone; his wife and children apparently lived unmolested after they moved to Salamá; at the time of the hearing, almost three years had passed since the 2011 mayoral election; and "the Patriota party ha[d] gained significant ground in Guatemala." Although none of this evidence is conclusive, we are not compelled to overturn the IJ's finding.

But the IJ and the BIA described no similar evidence to support their conclusion that, although "it would be economically difficult," it would be reasonable to expect García-Cruz to relocate internally. Instead, both essentially asserted that because García-Cruz's wife and children resided elsewhere in Guatemala, so could he.

8 C.F.R. § 1208.13(b)(3), however, lists a number of factors that an adjudicator should consider. "[W]hile the IJ and

-15-

BIA do not necessarily have to address each of [8 C.F.R. § 208.13(b)(3)'s] reasonableness factors explicitly . . . the agency must explain why the factors that cut against the asylum applicant outweigh the factors in his favor." Khattak v. Holder, 704 F.3d 197, 207 (1st Cir. 2013); see also Saldarriaga v. Gonzales, 241 F. App'x 432, 434 (9th Cir. 2007) (remanding asylum petition for further review because "the IJ did not consider whether [the petitioner's] relocation would be reasonable"). In Khattak, the BIA determined that the petitioner could relocate to another part of Pakistan where he owned a home and had briefly lived twenty years earlier. 704 F.3d at 206-07. We remanded to the BIA, however, because (1) "neither the IJ nor the BIA addressed evidence in the record indicating that" the petitioner would not be safe in that area and (2) "neither the IJ nor the BIA made any mention of [the reasonableness] factors." Id. at 207.

Relevant factors here include:

- "ongoing civil strife within the country" (the IJ found that "electoral violence" is common "in every electoral cycle");

- "economic . . . infrastructure" (the IJ found that relocation "would be economically difficult");

- "social and cultural constraints" (García-Cruz speaks Quiché, a minority language that has no official status and is spoken mainly in Guatemala's central highlands); and

- "familial ties" (all of García-Cruz's extended family live in Chixocol).

-16-

Yet the IJ and the BIA discussed only the fact that García-Cruz's wife and children were in Salamá. They did not address evidence in the record that appears to undercut the conclusion that García-Cruz could reasonably relocate within Guatemala -- for example, García-Cruz's testimony that he could not live with his wife in Salamá and does not "have a home . . . [or] a job" there. Thus, neither the BIA nor the IJ "presented a reasoned analysis of the evidence as a whole." Id. at 208 (quoting Jabri v. Holder, 675 F.3d 20, 24 (1st Cir. 2012)).

García-Cruz asserts that "every single factor" supports a conclusion that he cannot reasonably relocate, but he does little to develop this argument. He then asserts that the BIA's "unfounded conclusion . . . itself requires reversal." That is not accurate. To reverse the BIA's order, rather than simply remand it, the evidence must compel us to conclude that it would be unreasonable for García-Cruz to relocate within Guatemala. Id. at 207 (citing INS v. Elías-Zacarías, 502 U.S. 478, 481 n.1 (1992)). There is significant evidence in the record supporting a conclusion that relocation would be unreasonable. But García-Cruz has understandably focused on the BIA's failure to properly analyze the reasonableness factors, rather than whether the evidence compels a finding that internal relocation would be unreasonable, and neither the IJ nor the BIA weighed the

reasonableness factors.  Given the limited analysis on this issue, we think it best to remand to the BIA to consider it fully.  We therefore grant the petition for review, vacate the BIA's order, and remand for further proceedings.[3]

### CONCLUSION

Petition for review **granted**, order **vacated**, and case **remanded** for further proceedings.

"**Dissenting opinion follows**"

---

[3]  Because we vacate the BIA's denial of García-Cruz's asylum petition, we do not reach García-Cruz's withholding of removal and CAT claims.

**KAYATTA**, **Circuit Judge, dissenting in part**.  I agree with my colleagues that the record supports the BIA's finding that the events occurring before García-Cruz left Guatemala to enter the United States in May of 2012 did not constitute the type of persecution that creates a presumption of a well-founded fear of future persecution.  I also agree that the record supports the BIA's finding that García-Cruz could have, in any event, safely moved elsewhere in Guatemala.

I cannot agree, however, that we have jurisdiction to adjudicate García-Cruz's newly minted argument that the agency failed to consider adequately the relevant factors in finding that it would be "reasonable" to expect him to relocate within Guatemala.  Congress has stated that we "may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right."  8 U.S.C. § 1252(d)(1).  This means "that theories not advanced before the BIA may not be surfaced for the first time in a petition for judicial review of the BIA's final order."  Makhoul v. Ashcroft, 387 F.3d 75, 80 (1st Cir. 2004).  We have further concluded that "[t]his exhaustion requirement is jurisdictional; that is, it constitutes a limitation on our power of review."  Mazariegos-Paiz v. Holder, 734 F.3d 57, 62 (1st Cir. 2013); see also Sousa v. INS, 226 F.3d 28, 31 (1st Cir. 2000) ("Whatever our own views, we are

-19-

bound by precedent to apply the INA exhaustion requirement in a more draconian fashion.").

As my colleagues concede, García-Cruz never raised before the BIA his challenge to the thoroughness of the IJ's consideration of the factors set forth in 8 C.F.R. § 1208.13(b)(3) in finding that relocation within Guatemala would be reasonable. In order to leap over this significant jurisdictional hurdle, my colleagues declare that the BIA sua sponte raised and exhausted the issue of whether relocation would be reasonable. They then assert that we can find, essentially, that the BIA's sua sponte exhaustion of that issue was not exhaustive enough, because the BIA did not also sua sponte evaluate factors that García-Cruz never faulted the IJ for allegedly failing to consider.

To explain my disagreement, I first recount exactly what transpired before the agency. On the subject of relocation, the IJ stated the following:

> Given that the Patriota party has gained . . . ground [in Guatemala] and the president of the country is part of that party, the Court finds that the respondent could internally relocate and that, although it would be economically difficult to do that, it is reasonable to expect internal relocation rather than come to the United States.
>
> . . . Finally, the respondent's wife and children remain in Guatemala in a town nine to 10 hours away from Chixocol and the Court finds that it is reasonable for the respondent to relocate there and that he could do so safely.

-20-

It is plain from the above that the IJ made two relevant findings, consistent with the two-step analysis described in Matter of M-Z-M-R-, 26 I. & N. Dec. 28, 31–32 (B.I.A. 2012): (1) García-Cruz could safely relocate within Guatemala, and (2) it would be reasonable for him to do so.

As my colleagues acknowledge, in his appeal to the BIA, García-Cruz raised a question concerning only the first of those two findings. In García-Cruz's own words, the question was "[w]hether respondent can safely relocate within Guatemala." With respect to that question, he advanced only a single, specific argument (again in his words): "Respondent cannot safely relocate within Guatemala." And in support of that argument, he stated only:

> Respondent has demonstrated that he was targeted by political enemies from UNE y GANA, a national party. As a highly visible public supporter of this party, he runs the risk of being identified and targeted throughout the country.
>
> The fact that respondent's wife and children have not been harmed after fleeing their hometown should be given very little weight. Respondent's wife and children were not public supporters of the party and were not themselves politically active. Accordingly, it is unlikely that respondent's persecutors have been able to determine the identity and location of his family. In contrast, respondent's persecutors can easily recognize him on sight. Given these facts, the fact that respondent's wife and children have so far escaped harm does not indicate that he can also safely relocate within Guatemala.

-21-

(citations omitted).  The BIA directly responded to García-Cruz's argument with the following:

> [T]he Immigration Judge found that the respondent would be able to relocate to another area in Guatemala.  In this regard, the Immigration Judge noted that the respondent's wife and children remain in Guatemala in a town 9 or 10 hours away, strong evidence that the respondent could do so as well.
>
> We see no clear error of fact or mistake of law in the Immigration Judge's assessment.

(citations omitted).

To find from the foregoing that the BIA raised -- or even acknowledged -- a challenge to the IJ's step-two, reasonableness finding, one logically must point to language that one would not expect to find were the BIA simply discussing and rejecting García-Cruz's argument that it was not safe for him to relocate.  My colleagues point to no such language.  Rather, and without explanation, they point to the fact that the BIA said García-Cruz "would be able to relocate."  Yet this is what one would well expect the BIA to say in rejecting García-Cruz's argument that he could not safely relocate.  My colleagues otherwise point (again without explanation) to the BIA's observation that the fact that García-Cruz's wife and children remained in Guatemala provided strong evidence that García-Cruz could do so as well.  But this statement, too, was directly responsive to García-Cruz's argument that the experience of his

-22-

wife and children did not mean that he could safely relocate as well. In short, there is no basis for reading into the BIA's opinion any indication that it was addressing or even aware of any challenge to the IJ's step-two, reasonableness finding. Indeed, the very fact that my colleagues fault the BIA for not expressly weighing any of the step-two, reasonableness factors listed in 8 C.F.R. § 1208.13(b)(3) underscores my point: the BIA did not weigh those factors because it did not need to do so in order to respond to García-Cruz's challenge to the IJ's step-one, safety finding. To conclude otherwise is to conclude that the BIA decided on its own to raise a question about whether the IJ's consideration of the § 1208.13(b)(3) factors was thorough enough, and then decided not to say anything at all about the regulation, the factors, or the thoroughness of the IJ's review. If this is exhaustion, then fatigue must be pandemic at the BIA.

The foregoing explains why the BIA did not hint at or acknowledge the reasonableness issue. But even such a hint or acknowledgement would not have been enough to justify my colleagues' finding of sua sponte exhaustion. Our precedent requires the BIA to "squarely address[]" an issue in order for us to find that it sua sponte exhausted the issue. Mazariegos-Paiz, 734 F.3d at 63; see also Velerio-Ramirez v. Lynch, 808 F.3d 111, 117 (1st Cir. 2015) (finding that the BIA sua sponte exhausted the

-23-

issue of which law applied because the BIA "addressed applicable law directly" by "remarking on the IJ's erroneous use of removal law, stating that [petitioner's] application is governed by deportation law, and making [an] additional unbriefed determination" regarding the issue). Applied with straight-faced rigor, this "squarely address[]" test ensures that we recognize sua sponte exhaustion only when "the agency makes clear its wish to entertain the argument." Garcia-Carbajal v. Holder, 625 F.3d 1233, 1239 (10th Cir. 2010) (Gorsuch, J.).

I am at a loss to explain how the BIA's opinion "squarely addressed" a challenge to the IJ's finding not merely that it would be safe for García-Cruz to relocate, but also that it would be reasonable for him to do so. Perhaps what my colleagues mean to say is that if one discusses the first step of the two-step 8 C.F.R. § 1208.13(b)(2)(ii) inquiry, then one necessarily "exhausts" all challenges to the second step as well. But if this were so, then we would hold that García-Cruz himself, merely by challenging the IJ's first-step finding as to safety, also exhausted his claim that the IJ committed procedural error in making the reasonableness determination required by the second step of the analysis. And since my colleagues correctly do not so hold, they must think that the BIA raised something that García-

-24-

Cruz did not, and then squarely addressed it. Yet I can find no explanation in my colleagues' opinion of how this is so.

The exhaustion requirement established by 8 U.S.C. § 1252(d)(1), like most issue-preservation rules, ensures a modicum of repose and orderliness in the narrowing of issues that occurs as a dispute progresses through several layers of review. This requirement preserves the agency's statutory prerogative to go first, while also avoiding the delay and uncertainty that would result from multiple rounds of agency review. See Mazariegos-Paiz, 734 F.3d at 62-63 (citing, inter alia, SEC v. Chenery, 332 U.S. 194, 200-01 (1947)). Sua sponte exhaustion does not hinder the achievement of these goals, so long as we are confident that the agency really did do what it would have done had the petitioner properly raised an argument. The "squarely address[]" rule provides that assurance only because it demands unambiguous evidence that the agency exhausted the issue on its own. By contrast, my colleagues' dowsing for sua sponte, collateral exhaustion buried in the disposition of properly raised issues provides no such assurance. The notion that the agency itself, rather than the petitioner, may satisfy § 1252(d)(1)'s exhaustion requirement already stretches the boundaries of our jurisdictional grant. At least, though, we can say that the purposes of the exhaustion requirement are served when the BIA, for whatever

-25-

reason, has squarely addressed the petitioner's otherwise unpreserved basis for challenging the IJ's decision.  See id. When we take the yet further step of gleaning exhaustion from a record as bare as this one, on issues that, as here, raise no constitutional considerations, we abandon both statutory text and congressional purpose, and place ourselves in direct conflict with not only our own precedent, see id., but also the precedent of at least one other circuit, see Garcia-Carbajal, 625 F.3d at 1238–39.  Such, I fear, may tempt Congress to conclude that the circuit courts of appeals cannot be trusted with our already limited power of review in this domain.  I therefore respectfully dissent from the order remanding this case to the BIA.