# United States Court of Appeals
## For the First Circuit

No. 13-1337

ELISEO ESTEBAN MARTINEZ,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE

BOARD OF IMMIGRATION APPEALS

Before

Howard, Ripple[*] and Thompson,
Circuit Judges.

Timothy J. Nutter, on brief for petitioner.
Stuart F. Delery, Acting Assistant Attorney General, Civil Division, and Jamie M. Dowd, Senior Litigation Counsel, Office of Immigration Litigation, and Dana M. Camilleri, Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, on brief for respondent.

November 4, 2013

[*] Of the Seventh Circuit, sitting by designation.

**RIPPLE, <u>Circuit Judge</u>**.  Eliseo Esteban Martinez, a native and citizen of Guatemala, was refused entry into Canada from the United States.  He was taken into United States custody, where he admitted to a Border Patrol agent that he was in the United States illegally to make money for his family.  Mr. Martinez later sought relief under the Convention Against Torture ("CAT"), claiming that he was likely to be tortured by gang members if he were returned to Guatemala.  At a hearing before an immigration judge ("IJ"), the Department of Homeland Security ("Department" or "DHS")[1] contested Mr. Martinez's claims.  The IJ found that Mr. Martinez was not credible and, consequently, denied relief and ordered removal.  The Board of Immigration Appeals ("BIA" or "Board") dismissed his appeal.[2]  Mr. Martinez now petitions for review of the decision of the Board.[3]  Because the administrative record does not require the conclusion that Mr. Martinez is credible and because the Board did not commit legal error in denying his request for relief under the CAT, we deny the petition for review.

---

[1]  For ease of reading, we use the terms "Department" or "DHS" as inclusive of its predecessor entities, including the Immigration and Naturalization Service, as well as its current subdivisions, including the United States Citizenship and Immigration Services.

[2]  The Board had jurisdiction under 8 C.F.R. § 1003.1(b)(3), (9).  <u>See</u> <u>also</u> 8 U.S.C. § 1103(g).

[3]  We have jurisdiction under 8 U.S.C. § 1252(a)(5).

## BACKGROUND

### A. Mr. Martinez's Entry into Custody

On April 14, 2007, Mr. Martinez was traveling with others to a church conference in North Carolina from Massachusetts when the vehicle in which he was riding became lost. Traveling north on an interstate highway, rather than south, it came to the United States-Canadian border. The occupants were refused entry into Canada and, upon attempting to reenter the United States, were taken into United States custody. Mr. Martinez gave a sworn statement to a United States Immigration and Naturalization Service official on a Form I-877, in which he stated that he is a citizen of Guatemala who had entered the United States illegally by crossing the Mexican border in February 2002. He also admitted that he had attempted to enter the United States illegally three times before his most recent entry.[4] Mr. Martinez explained that he had entered the United States to earn income for his family. Mr. Martinez did not sign his Form I-877.

In removal proceedings following his apprehension at the Canadian border, Mr. Martinez filed an application for withholding

---

[4] Mr. Martinez stated that he had been "encountered at least three times by U.S. Border Patrol and returned to Mexico all three times" though he "was never detained."

of removal on September 20, 2007.[5]  An IJ held a hearing on Mr. Martinez's application on October 12, 2010.  Mr. Martinez was represented by counsel at the hearing and was the only witness to testify.  He ultimately presented two versions of the relevant events-one in his application and initial testimony before the IJ, and the other in testimony on redirect following cross-examination by the Department.

## B.  Mr. Martinez's Initial Account of Events

Mr. Martinez's application for relief under the CAT, signed under penalty of perjury, asked him to list each entry he had made into the United States.  He listed only one entry, on February 2, 2002, which he had made by crossing the Mexican border near San Ysidro, California.  Mr. Martinez claimed that he left Guatemala after having been threatened and attacked by gang members there.  At trial, Mr. Martinez repeated that he had entered the United States in 2002.  He stated that he had not returned to Guatemala after leaving that country in January 2002.  Mr. Martinez also stated in his application that he had been arrested only once-for driving without a license in Massachusetts in 2004.

---

[5]  Though he now seeks protection under the CAT, Mr. Martinez also applied for asylum under 8 U.S.C. § 1158(a) and withholding of removal under 8 U.S.C. § 1231(b)(3)(A).  He later acknowledged that his asylum claim was not timely and that he was seeking withholding of removal only under the CAT, not the Immigration and Nationality Act.  See A.R. at 65.

On his application and in his initial testimony, Mr. Martinez described a series of threats and attacks against him by gang members. He stated that the attacks had begun when he was waiting alone in a truck in Guatemala City in January 2001 while working as a loader for a potato farmer. Four heavily tattooed men with guns and knives had approached him and attempted to take the truck, but Mr. Martinez had resisted. The men then removed him from the truck and began beating him. They threatened that he either could give them the truck or join their criminal activities by becoming part of their gang, the Mara Salvatrucha ("MS-13"). After he refused, they beat him until he could not stand and then left him with a warning that they would return to hear his response.

Continuing his account, Mr. Martinez stated that, three days later, the same four men had attacked him while he was waiting alone in the truck in a parking lot near the potato warehouse where he worked in Guatemala City. When he again refused to join their gang, they beat him over the head with a pistol and threatened to kill him. The men kicked and beat him on the ground to the point that Mr. Martinez lost consciousness. When Mr. Martinez returned home, he discovered that the men had been there looking for him. His father falsely had claimed to the men that he did not know Mr. Martinez's location.

The next day, the four men approached Mr. Martinez while he was walking home from work. After he refused to join the gang, they beat and kicked him. They also instructed him to meet them in a nearby village, Aldea Ceresos, if he wanted to avoid further attacks. Mr. Martinez instead remained inside his home for three weeks out of fear.

Mr. Martinez then ventured out to a festival in a nearby village, Aldea Villanueva, with three friends.[6] The four men located him in the crowd, pointed a gun at him and took him from the festival to a dump area where they began beating him once more. During the beating, one man cut Mr. Martinez's hand with a knife.[7] Mr. Martinez threatened to report the men to the police, and they beat him until he lost consciousness. After a group of ten to fifteen people began approaching to see what was happening, the four men left. Mr. Martinez's friends then brought him to the San Marcos hospital where he spent two days recovering from his injuries. His hospital stay was in February 2001.

Mr. Martinez reported that he was afraid for his life after his hospitalization and remained inside his home for three months. During that time, the men asked for him at his home, but

---

[6] In an affidavit attached to his application, Mr. Martinez remembered that only three days passed between the attack and the festival, not three weeks.

[7] In his affidavit, Mr. Martinez stated that his wrist and knee were cut during the attack, not his hand.

they were told he was not there. In May 2001, he ventured out to a marketplace with a friend, where the four men found him and pulled him from the crowd. One of the men pointed a gun at Mr. Martinez and the men beat him until a crowd began to notice them.

Two weeks later, in June 2001, the four men came to Mr. Martinez's home while his parents were away. They threatened to kill him or his family if he did not join them. Mr. Martinez filed a complaint with the police the day after this encounter. As evidence of this event, he submitted with his application a police report dated June 12, 2001, which noted that Mr. Martinez had received threats from MS-13 gang members while leaving work, that his right hand was injured and that the gang members had attempted to extort money from him.[8] In an affidavit attached to his application, Mr. Martinez reported that the police were unsuccessful in their attempts to question the perpetrators.

Three weeks after Mr. Martinez filed his police report, his father was robbed and beaten by members of the gang who had learned about the report. The men told Mr. Martinez's father that they would continue beating him and would kidnap other family members if Mr. Martinez did not join them. Following his father's

---

[8] The police report did not mention the alleged encounter at Mr. Martinez's home.

advice, Mr. Martinez then decided to come to the United States. He left Guatemala "shortly thereafter."[9]

Mr. Martinez stated in his application that he had left Guatemala on January 5, 2002, and he had been warned that, if he returned to Guatemala, he would be killed. He testified that he finally was able to get into the United States in February 2002, where he remained until he was taken into custody in 2007. Mr. Martinez asserted that the police in Guatemala could not protect him from torture by the gang because the police lacked resources and capabilities. Mr. Martinez contended that the ability of the gangs in Guatemala to hurt him is evidenced by their past attacks on him.

In addition to the evidence submitted with his application and his own testimony before the IJ, Mr. Martinez offered a letter from his father dated January 27, 2009. In that letter, Mr. Martinez's father, Julian Esteban Chavez, stated that Mr. Martinez had been threatened and persecuted by members of the MS-13 gang. Mr. Chavez further stated that Mr. Martinez had left Guatemala in order to escape the gang and that returning there would threaten Mr. Martinez's safety.

---

[9]  A.R. at 114.

## C. Mr. Martinez's New Version of Events on Redirect

During cross-examination, DHS confronted Mr. Martinez with evidence that he had committed a motor vehicle violation, driving without a license, in September 2001. DHS asked Mr. Martinez how he could have a criminal record in the United States from 2001 if he first entered the country in February 2002. Mr. Martinez then admitted that he had been arrested for driving without authorization in 2001. When DHS again asked how he could have committed a motor vehicle violation in September 2001 if he first had entered the United States in 2002, Mr. Martinez stated that he had not understood the question.

During redirect from his attorney, Mr. Martinez offered a different account of events than the one he initially presented. He testified that he had entered the United States twice before February 2002. The first time, in December 2000, he entered the United States from Mexico but was apprehended by border patrol agents near the border and was sent back to Mexico. Mr. Martinez then remained briefly in Mexico before returning to his home in Guatemala, where the gang began harassing him in January 2001.

After his encounters with the gang, Mr. Martinez entered the United States illegally in July 2001. He remained there until November 2001. Mr. Martinez testified that he had decided to return to Guatemala after his September 2001 arrest for a motor vehicle violation because he was "ignorant about the way things

work[]" in the United States and "scared."[10]  He left the United States in November 2001 and went to Mexico.  Mr. Martinez spent a few weeks in Mexico to earn money to reenter the United States, then returned to Guatemala "to make more money."[11]

Mr. Martinez testified that he did not mention his entries before 2002 in his application and initial testimony because he thought that only his most recent entry was "permanent" and therefore relevant.[12]  He attributed his earlier inconsistent responses to a "misunderstanding" of "how things work here and what they mean when they're asking certain questions."[13]

## D.  The IJ and BIA Decisions

On October 12, 2010, the IJ issued an oral decision denying Mr. Martinez's application for relief and ordering him removed to Guatemala.  The IJ concluded that the contradictions and omissions in Mr. Martinez's submissions and testimony evidenced he was not credible.  The IJ noted that after being taken into custody, Mr. Martinez stated that he had entered the United States to earn income rather than to escape a threat in Guatemala.  The IJ also observed that Mr. Martinez did not reveal that he had first

---

[10]  Id. at 86.

[11]  Id. at 87.  The record does not explain why Mr. Martinez chose to leave the United States but then began saving money to reenter it.

[12]  Id. at 88.

[13]  Id. at 87–88.

entered the United States before February 2002 in his application or his initial testimony; Mr. Martinez only admitted to prior entries after being confronted with contradictory evidence. The IJ found that Mr. Martinez's voluntary return to Guatemala in November 2001, after the alleged gang attacks had occurred, undermined his assertion that he feared being tortured or killed if he returned to Guatemala. The IJ concluded that Mr. Martinez had not met his burden of establishing a clear probability that he would be tortured by groups that the government of Guatemala is unable to control if he were returned.

The BIA dismissed Mr. Martinez's appeal on February 14, 2013. The BIA determined that the IJ had not clearly erred in its adverse credibility finding because Mr. Martinez testified that he had fled Guatemala to escape a criminal gang but, on his Form I-877, he had stated that he entered the United States to work and make money. The BIA further determined that Mr. Martinez had not offered a persuasive explanation when confronted during cross-examination with inconsistencies between his actual history and his sworn Form I-877 statement and his testimony.

Mr. Martinez timely sought review in this court.

**II**

**DISCUSSION**

As this case comes to us,[14] Mr. Martinez presents two
issues for our decision. First, he submits that the Board's
determination that he is not credible is not supported by
substantial evidence. Second, he contends that the Board erred in
determining that he had failed to meet his burden of demonstrating
that he would be tortured with the consent or acquiescence of the
Guatemalan government. He makes clear, however, that this second
point is contingent on our accepting his credibility argument.

**A.**

Mr. Martinez seeks relief under the CAT. An applicant
for CAT protection "must bear the burden to prove, by objective
evidence, that it is more likely than not that he will be tortured
if he is deported." Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir.
2004) (emphasis omitted). "Torture is defined as any act by which
severe pain or suffering, whether physical or mental, is
intentionally inflicted on a person . . . when such pain or
suffering is inflicted by or at the instigation of or with the
consent or acquiescence of a public official or other person acting
in an official capacity." 8 C.F.R. § 1208.18(a)(1). Torture does

---

[14] Mr. Martinez has conceded that he cannot establish
eligibility for asylum or for withholding of removal under the
Immigration and Nationality Act.

not include "lesser forms of cruel, inhuman or degrading treatment or punishment."  Id. § 1208.18(a)(2).

We review for substantial evidence the Board's determination that Mr. Martinez was not credible.  See Liu Jin Lin v. Holder, 723 F.3d 300, 305 (1st Cir. 2013).  Under the substantial evidence standard, the decision of the Board "must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole."  Immigration & Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (internal quotation marks omitted).  Reversal is appropriate only where "a reasonable factfinder would have to" reach a contrary conclusion.  Id.; see also Aguilar-Solis v. Immigration & Naturalization Serv., 168 F.3d 565, 571 (1st Cir. 1999) (instructing courts to accord "significant respect" to a hearing officer's credibility determination "as long as the findings on which it rests have sufficiently sturdy roots in the administrative record").[15]

---

[15]  The Government contends that we should review the decision of the Board and the IJ together, citing Tobon-Marin v. Mukasey, 512 F.3d 28, 30 (1st Cir. 2008).  See Gov't Br. 12.  Tobon-Marin instructs us to review both decisions when "the BIA adopted and supplemented the IJ's opinion with its own substantive gloss." Tobon-Marin, 512 F.3d at 30.  That is not an apt description of the record in this case.  The BIA rendered its own decision.  It affirmed, but did not adopt, the decision of the IJ.  The Board's determination on these issues therefore is the final agency decision under review.  See Pulisir v. Mukasey, 524 F.3d 302, 307-08 (1st Cir. 2008); see also Lin v. Mukasey, 521 F.3d 22, 26 (1st Cir. 2008) (noting that, where the BIA does not adopt the IJ's opinion, we review the ruling of the BIA standing alone).

A specific statutory provision further guides our assessment of whether the "roots" of the assessment are "sufficiently sturdy." Section 1158(b) of Title 8 of the United States Code governs adverse credibility determinations for claims, such as this one, that were filed after May 11, 2005. REAL ID Act of 2005, Pub. L. No. 109-13, § 101(a)(3), 119 Stat. 302, 303 (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)). The statute requires an immigration fact-finder to base credibility determinations on the totality of the circumstances:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii); see also Jianli Chen v. Holder, 703 F.3d 17, 22 (1st Cir. 2012) (noting that courts should "proceed to evaluate the adverse credibility determinations under these guidelines and in light of the totality of the circumstances").

-14-

**B.**

Our examination of the record reveals that the Board's determination is supported by substantial evidence. Mr. Martinez's own testimony on redirect contradicts his application and his initial testimony. After being taken into custody, Mr. Martinez stated that he entered the United States to earn income. Later he claimed to have entered to escape a gang in Guatemala. He wrote in his application and testified before the IJ that he entered the United States in 2002, but then admitted after cross-examination that he also entered the United States in 2000 and 2001. When questioned, he did not provide a persuasive explanation for why he voluntarily returned to Guatemala in November 2001 after fleeing Guatemala in July 2001 because of threats and beatings by the gang. Mr. Martinez cites no applicable First Circuit precedent for his assertion that the Board erred in finding Mr. Martinez not credible.[16]

Mr. Martinez attempts to explain the inconsistencies in his submissions and testimony as simple misunderstandings resulting from confusion. He claims that he initially disclosed only his

---

[16] Mr. Martinez cites several cases from other circuits holding that an immigration judge should seek clarification before basing an adverse credibility determination on a latent discrepancy rather than a self-evident discrepancy. See Pet'r's Br. 15. These cases are not relevant here because Mr. Martinez's testimony contained self-evident discrepancies about his dates of entry into the United States and because the IJ allowed counsel to seek clarification during further questioning.

February 2002 entry because he believed it was his only permanent, and therefore relevant, entry. Although questions certainly may be misinterpreted, his explanation is not so compelling that the fact-finder was required to credit it. See Rivas-Mira v. Holder, 556 F.3d 1, 5 (1st Cir. 2009) (holding that an IJ was not required to accept a petitioner's unconvincing attempts to explain significant anomalies).[17] Mr. Martinez was represented by counsel before the IJ and his testimony evidences no general difficulty understanding and responding to questions. Mr. Martinez's many missed opportunities to disclose his earlier entries into the United States also demonstrate more than mere confusion, particularly because his affidavit and initial testimony covered a time period that included his 2001 entry into the United States. It is clear on the face of the record that the BIA and IJ weighed and rejected the possibility that Mr. Martinez's inconsistencies were the result of mere confusion about the import of questions.

Mr. Martinez also contends that the BIA and IJ erred in giving undue weight to his unsigned Form I-877, which he completed

---

[17] See also Wen Feng Liu v. Holder, 714 F.3d 56, 60-61 (1st Cir. 2013) (affirming lack of credibility finding where petitioner added details to his testimony only when confronted by a change in the law); Qin v. Ashcroft, 360 F.3d 302, 308 (1st Cir. 2004) (holding that "the IJ was entitled to, and did, disbelieve" a petitioner's assertions). Even statements that are not intended to mislead can lack credibility. See Seng v. Holder, 584 F.3d 13, 19 (1st Cir. 2009) ("A statement may be untrue (and, thus, not credible) because of lack of knowledge, faulty memory, garbled expression, or other reasons, notwithstanding the declarant's intent to speak the truth.").

at the border.[18] Mr. Martinez's argument turns on the fact that the Form I-877 statement was not signed by him or any witness. Mr. Martinez did not make this argument before the IJ or the Board, and it is therefore waived.[19] In any event, the REAL ID Act permits a fact-finder to weigh even informal statements.[20] We note that, although Mr. Martinez did not sign the statement, the interview was conducted with Mr. Martinez under oath and with the assistance of an interpreter. The immigration officer who conducted the interview did sign the form. The IJ and the BIA knew the circumstances of Mr. Martinez's Form I-877 from the context of his testimony before the IJ. Mr. Martinez did not deny that he had told a Border Patrol agent that he entered the United States to earn income. He also admitted that he returned voluntarily to Guatemala in late 2001 in spite of the gang's alleged threats toward him earlier that year. The BIA's reliance on Mr. Martinez's Form I-877 was not excessive in light of these circumstances.

We must conclude that the Board's decision to dismiss Mr. Martinez's appeal of the IJ's adverse credibility determination is supported by substantial evidence. In light of this

---

[18] Pet'r's Br. 15-16.

[19] See 8 U.S.C. § 1252(d)(1); Olujoke v. Gonzáles, 411 F.3d 16, 22-23 (1st Cir. 2005).

[20] See 8 U.S.C. § 1158(b)(1)(B)(iii); see also Jianli Chen v. Holder, 703 F.3d 17, 23 (1st Cir. 2012) (noting that "[i]t is normally enough if the IJ reasonably finds a proffered piece of evidence to be reliable and its use to be fundamentally fair").

determination, we cannot accept, as Mr. Martinez frankly concedes, his second contention that he has met his burden of proof for relief under the CAT.  See Segran v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007).

## Conclusion

The conclusion of the BIA that Mr. Martinez was not credible is supported by substantial evidence.  Accordingly, the agency's decision denying his application for relief under the CAT must stand.

**PETITION DENIED.**