TORRUELLA, Circuit Judge.
Petitioner Felipe García-Cruz appeals from a Board of Immigration Appeals (“BIA”) decision, which affirmed an Immigration Judge’s (“U”) decision denying his applications for asylum, withholding of removal, and protection under the Convention Against Torture (“CAT”). García-Cruz argues that he presented sufficient evidence to establish both past persecution and a well-founded fear of future persecution, and that he could not reasonably relocate within Guatemala, the country of removal.
BACKGROUND
A. Factual Background[1]
García-Cruz is a native of Guatemala, from the village of Chixocol, in the municipality of Zacualpa. García-Cruz became involved in politics in June 2011, after seeing the Patriota (Spanish for “Patriot”) party’s mayoral candidate for Zacualpa, Gabriel Ventura, deliver a speech. That month, he joined the Patriota party, and by August he had become a member of the party’s executive committee. As a member of the committee, he traveled to campaign events to handle set up and logistics; in his time with the party, he helped prepare three rallies.
The incumbent mayor, Ernesto Cala-chij-Riz, belonged to the Une y Gana (Spanish for “Unite and Win”) party. According to García-Cruz, in the days leading up to the elections, Une y Gana members “began to carry weapons and threaten [Patriota supporters] with their weapons. They had guns and they had sticks and machetes ... and they knew who [Patriota supporters] were.” Une y Gana members also threatened to “kill anyone who voted for Ventura.” Patriota supporters were “ridiculed, sometimes even beaten by the Une y Gana party.” Nevertheless, García-Cruz and his family *4 cast their votes for Ventura on September 11, 2011.
That night, it was announced that Cala-chij-Riz, the Une y Gana candidate, had won the race. The next morning, Patriota members gathered at the Une y Gana victory rally, where a “huge fight broke out” and the “city hall was set on fire.” García-Cruz was at home at the time, but other Patriota supporters told him that “the Une y Gana party was going to kill off all the members of the [Patriota party].” In addition, the Une y Gana party made “a list of people they accused of being responsible for the fire.” García-Cruz was on the list, even though he “had nothing to do with the fire,” because of his “involvement in the Patriota party.”
García-Cruz received five threatening phone calls in the aftermath of the September 2011 election. The first came just days after the election, when an anonymous caller—who identified himself as an Une y Gana member—blamed García-Cruz for the fire, pledged to hold him responsible for it, and threatened his life. A second anonymous caller made similar allegations and stated: “We are watching you, and when we find you we will kill you.” García-Cruz became so concerned for his life that he stopped leaving his house. In the third call, the caller asked García-Cruz why he had stopped leaving the house, to which García-Cruz responded that he was frightened.
Fearing for his life, García-Cruz moved to Cobán, Alta Verapaz, Guatemala. There, he found work running games at fairs and carnivals. On October 9, 2011, while in Cobán, García-Cruz received the next phone call. The caller asked why he had left Chixocol and told García-Cruz that they knew where he was. In the fifth and final phone call, in January 2012, the caller told García-Cruz that if he did not return to Chixocol, Une y Gana would kidnap his wife and children. García-Cruz never reported the threatening phone calls to authorities. He claimed that the local police were “in the present mayor’s pocket,” and he feared word would get back to those threatening him if he reported the calls to the national police.
In the days after the fifth phone call, García-Cruz relocated his family to the village of Salamá, about ten hours from Chixocol. García-Cruz also removed the chip from his cell phone so that he would not receive any more calls. After saving enough money, García-Cruz left Guatemala for the United States in May 2012. Nothing suggests that he was either harmed or threatened further between January and May of 2012.
The political conflict in Zacualpa resulted in other Patriota members being targeted. García-Cruz averred that “other members of the Patriota party were being kidnapped and beaten.” Two or three weeks after the election, an acquaintance of Ventura was “taken from his home and beaten very badly.” Another Patriota member was abducted by Une y Gana and only returned as part of a prisoner exchange. García-Cruz also testified that he knew of “at least one” person who was killed by Une y Gana “in the year that [he] left.” García-Cruz does not know what happened to other members of the committee who were accused of burning the city hall, however. In June 2012, after García-Cruz fled Guatemala, Ventura was arrested by the police for alleged crimes against his political rivals, triggering further protests.
At the time of Garcia-Cruz’s hearing, the president of Guatemala was a member of the Patriota party, but the Une y Gana party remained in control of Zacualpa. In addition, Garcia-Cruz’s wife and children were still living in Salamá. García-Cruz, however, could not live with them because *5 they lived with his wife’s employer, and he would not be able to find work in Salamá.
B. Procedural History
García-Cruz conceded removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) and applied for asylum, withholding of removal, and protection under the CAT on January 22, 2013. On May 22, 2014, the IJ held a hearing on Garcia-Cruz’s application. The IJ found his testimony to be credible, but she ruled that García-Cruz did not establish past persecution. The IJ explained that García-Cruz was never physically harmed and had worked in public view, and the phone calls alone were not “so menacing as to have caused some actual harm” and so did not rise to the level of persecution. Moreover, given Garcia-Cruz’s failure to report the calls to authorities, the IJ “could not conclude the requisite government action or inaction.”
The IJ also concluded that Garcia-Cruz’s fear of future persecution was not well-founded; given the time elapsed and Garcia-Cruz’s limited involvement with the campaign, there was little support for his assertion that he would be targeted if he returned to Guatemala. Furthermore, the IJ found that, “although it would be economically difficult,” García-Cruz could relocate within Guatemala because Guatemala’s president at the time of the hearing was a member of the Patriota party and “the Patriota party ha[d] gained significant ground in Guatemala.” Specifically, García-Cruz could “reasonably]” and “safely” relocate to Salamá, where he had relocated his wife and children. Thus, the IJ denied Garcia-Cruz’s applications for both asylum and withholding of removal. The IJ concluded by denying Garcia-Cruz’s application for protection under the CAT given his failure to demonstrate that he would be subjected to torture by or with the acquiescence of a public official.
On September 30, 2015, the BIA upheld the IJ’s decision on two grounds. First, it adopted the IJ’s determination that the “five anonymous threatening phone calls were not so menacing as to have caused some actual harm,” and so they did not rise to the level of past persecution. Second, it found “no clear error of fact or mistake of law in the Immigration Judge’s assessment” that García-Cruz “would be able to relocate to another area in Guatemala.” It cited the fact that his wife and children lived in Salamá as “strong evidence that [García-Cruz] could do so as well.” Thus, the BIA ruled that García-Cruz was not eligible for either asylum or withholding of removal. Finally, the BIA affirmed that García-Cruz failed to establish that “he had ever been tortured or that government officials seek to torture him.”[2] The BIA therefore dismissed his appeal, and García-Cruz petitioned this Court for review.
ANALYSIS
We review the BIA’s findings of fact under a “substantial evidence” standard, and we will uphold them if they are “supported by reasonable, substantial, and probative evidence on the record considered as a whole.” Xin Qiang Liu v. Lynch, 802 F.3d 69, 74 (1st Cir. 2015) (quoting Hasan v. Holder, 673 F.3d 26, 33 (1st Cir. *6 2012)). Questions of law are reviewed de novo. Id. Thus, we will reverse the BIA’s determination only if “any reasonable adjudicator would be compelled to conclude to the contrary.” 8 U.S.C. § 1252(b)(4)(B).
To be eligible for asylum, García-Cruz must establish that he is unwilling or unable to return to Guatemala “because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. § 1101(a)(42)(A). “Proof of past persecution creates a presumption of a well-founded fear of future persecution.” Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014); 8 C.F.R. § 1208.13(b)(1). But the Government can rebut this presumption by demonstrating either changed circumstances or that García-Cruz “could avoid future persecution by relocating to another part of [Guatemala] ... and under all the circumstances, it would be reasonable to expect [him] to do so.” 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B). Similarly, García-Cruz cannot establish a well-founded fear of future persecution if he “could avoid persecution by relocating to another part of [Guatemala] ... [and] under all the circumstances it would be reasonable to expect [him] to do so.” 8 C.F.R. § 1208.13(b)(2)(ii).
A. Substantial Evidence Supported the BIA’s Determination that García-Cruz Did Not Suffer Past Persecution
García-Cruz sought to demonstrate that he suffered persecution in Guatemala, in the form of death threats, on account of his political beliefs, thus creating a rebuttable presumption that he will more likely than not suffer persecution if returned to Guatemala. See 8 C.F.R. § 1208.13(b)(1). “[Credible, specific threats can amount to persecution if they are severe enough.” Javed v. Holder, 715 F.3d 391, 395-96 (1st Cir. 2013). “ ‘Threats of murder’ fit squarely within this rubric.” Id. at 396 (quoting López de Hincapié v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007)). “[T]he addition of physical violence” is not required for a finding of past persecution, id., but “threats standing alone constitute past persecution in only a small category of cases, and only when the threats are so menacing as to cause significant actual suffering or harm.” Bonilla v. Mukasey, 539 F.3d 72, 77 (1st Cir. 2008) (quoting Tobon-Marin v. Mukasey, 512 F.3d 28, 32 (1st Cir. 2008)).
In Bonilla, the petitioner received frequent telephone calls from a militant group threatening his and his family’s lives because of his support for a presidential candidate. Id. at 74-75. After he changed his telephone number, the same group left a letter outside his apartment declaring the petitioner “a military target.” Id. at 75. The BIA adopted the immigration judge’s ruling that this was not past persecution. Id. at 76. We affirmed, stating that “we [could not] say that the agency was compelled to find that [the petitioner] was persecuted.” Id. at 78. Similarly, in Un v. Gonzales, the petitioner was twice confronted by government agents, who told him on the second occasion that he would be killed, and a friend subsequently told him to “go into hiding because they were ‘looking to kill [the petitioner].’ ” 415 F.3d 205, 207-08 (1st Cir. 2005). The BIA had not considered the possibility of past persecution, and we remanded for a finding because “we [could not] say the evidence compels a conclusion either way.” Id. at 209.
The intensity and credibility of the threats received by García-Cruz are similar to those in Bonilla and Un. Bonilla in particular seems factually analogous, closer than cases like Javed, 715 F.3d 391, *7 cited by García-Cruz, in which we have held that threats constituted persecution as a matter of law. Although the BIA certainly could have found that García-Cruz suffered past persecution on this record, given our deferential standard of review, we cannot say that it was compelled to do so.
B. The BIA Did Not Correctly Analyze Whether It Would Be Reasonable to Expect García-Cruz to Relocate Within Guatemala
The BIA concluded that García-Cruz “did not establish ... a well-founded fear of persecution.” However, it did so on only one possible ground—by adopting the IJ’s finding that García-Cruz “would be able to relocate to another area in Guatemala.”
“An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant’s country of nationality ... if under all the circumstances it would be reasonable to expect the applicant to do so.” 8 C.F.R. § 1208.13(b)(2)(ii). When determining whether such internal relocation is reasonable:
adjudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.
8 C.F.R. § 1208.13(b)(3).
Determining whether an applicant can reasonably relocate within the applicant’s country of nationality entails a two-step analysis. Matter of M-Z-M-R-, 26 I. & N. Dec. 28, 32 (2012). First, the BIA must decide whether there is a safe area of the country, he., one where the applicant would have no well-founded fear of persecution. Id. Second, if there is such an area, the BIA must analyze whether “it would be reasonable for the applicant to relocate,” applying the considerations of 8 C.F.R. § 1208.13 (b)(3). Id. at 34-35 (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)).
1. Jurisdiction
Before we proceed, we must determine whether we can review all of García-Cruz’s arguments. We may only review Garda-Cruz’s claims if he “has exhausted all administrative remedies available to [him] as of right.” 8 U.S.C. § 1252(d)(1). In his appeal to the BIA, García-Cruz argued only that he would not be safe if he relocated within Guatemala. He did not argue that the IJ made any error in determining that it would be reasonable for him to relocate. Before us, however, García-Cruz also argues that the IJ and the BIA did not properly apply the considerations listed in 8 C.F.R. § 1208.13(b)(3).
The Government has not raised this issue, and it appears that we have not previously addressed whether we would raise failure to exhaust sua sponte in the asylum context. But administrative exhaustion in this context is an “inquiry into subject-matter jurisdiction,” Mazariegos-Paiz v. Holder, 734 F.3d 57, 62 (1st Cir. 2013), and where a requirement is jurisdictional— where it “affect[s] a court’s constitutional or statutory power to adjudicate a case”— a party’s failure to fulfill that requirement is “nonwaivable.” Bennett v. City of Holyoke, 362 F.3d 1, 7-8 (1st Cir. 2004); see also Alphas Co. v. William H. Kopke, Jr., Inc., 708 F.3d 33, 36-38 (1st Cir. 2013). We therefore hold that we may determine whether a petitioner has exhausted his or her administrative remedies as required by 8 U.S.C. § 1252(d)(1), even if no party has addressed the issue.
*8 A petitioner generally “cannot proffer a theory to the IJ, forgo any presentation of that theory to the BIA, and then resurrect the theory on a petition for judicial review.” Ramírez-Matías v. Holder, 778 F.3d 322, 327 (1st Cir. 2015). Although a party presenting an issue to the BIA is the most common way in which an issue is exhausted, however, it is not the only way. Mazariegos-Paiz, 734 F.3d at 62. Even if an issue was not raised by a party, the issue is exhausted if the BIA addresses the issue on the merits. Id at 63 (“Where an agency has opted to [address an issue], there is no logical reason why exhaustion should turn on which party (if either) brought the issue to the agency’s attention.”); see also Xin Qiang Liu, 802 F.3d at 74 (“The exhaustion requirement is satisfied where the agency chooses to address the merits of a particular issue, regardless of whether the alien raised that issue.” (quoting Meng Hua Wan v. Holder, 776 F.3d 52, 56 (1st Cir. 2015))).
Here, the IJ squarely addressed the issue. It found that although “it would be economically difficult [for García-Cruz to relocate], it is reasonable to expect internal relocation rather than to come to the United States.” The IJ further explained that Garcia-Cruz’s “wife and children remain in Guatemala in a town nine to [ten] hours from Chixocol” and so it would be “reasonable for [him] to relocate there”—plus, the IJ added, “he could do so safely.”
For its part, the BIA repeated how the IJ had found that García-Cruz “would be able to relocate to another area in Guatemala.” The BIA then stressed that “[i]n this regard,” the IJ had noted that Garcia-Cruz’s “wife and child remain in Guatemala in a town 9 or 10 hours away, strong evidence that [he] could do so as well.” And the BIA found “no clear error of fact or mistake of law with the [IJ’s] assessment.” The BIA therefore briefly addressed the reasonableness of internal relocation on its own—finding that his wife and children remaining in Guatemala was “strong evidence” that he could relocate— and it adopted the IJ’s more detailed reasoning on that point. Thus, we can review both whether the BIA properly found that it was safe for García-Cruz to relocate within Guatemala—which García-Cruz has raised at every level—and whether the BIA properly found that he could reasonably do so—an issue which the BIA addressed on the merits.
2. The Merits
Substantial evidence supports the BIA’s finding that García-Cruz could safely relocate within Guatemala. As the IJ described: García-Cruz lived in Cobán from January 2012 to May 2012 without any further threats after removing the chip from his phone; his wife and children apparently lived unmolested after they moved to Salamá; at the time of the hearing, almost three years had passed since the 2011 mayoral election; and “the Patrio-ta party ha[d] gained significant ground in Guatemala.” Although none of this evidence is conclusive, we are not compelled to overturn the IJ’s finding.
But the IJ and the BIA described no similar evidence to support their conclusion that, although “it would be economically difficult,” it would be reasonable to expect García-Cruz to relocate internally. Instead, both essentially asserted that because Garcia-Cruz’s wife and children resided elsewhere in Guatemala, so could he.
8 C.F.R. § 1208.13(b)(3), however, lists a number of factors that an adjudicator should consider. “[W]hile the IJ and BIA do not necessarily have to address each of [8 C.F.R. § 208.13(b)(3)’s] reasonableness factors explicitly ... the agency must explain why the factors that cut against the asylum applicant outweigh the factors in *9 his favor.” Khattak v. Holder, 704 F.3d 197, 207 (1st Cir. 2013); see also Saldarriaga v. Gonzales, 241 Fed.Appx. 432, 434 (9th Cir. 2007) (remanding asylum petition for further review because “the IJ did not consider whether [the petitioner’s] relocation would be reasonable”). In Khattak, the BIA determined that the petitioner could relocate to another part of Pakistan where he owned a home and had briefly lived twenty years earlier. 704 F.3d at 206-07. We remanded to the BIA, however, because (1) “neither the IJ nor the BIA addressed evidence in the record indicating that” the petitioner would not be safe in that area and (2) “neither the IJ nor the BIA made any mention of [the reasonableness] factors.” Id. at 207.
Relevant factors here include:
• “ongoing civil strife within the country” (the IJ found that “electoral violence” is common “in every electoral cycle”);
• “economic ... infrastructure” (the IJ found that relocation “would be economically difficult”);
• “social and cultural constraints” (García-Cruz speaks Quiché, a minority language that has no official status and is spoken mainly in Guatemala’s central highlands); and
• “familial ties” (all of Garcia-Cruz’s extended family live in Chixocol).
Yet the IJ and the BIA discussed only the fact that Garcia-Cruz’s wife and children were in Salamá. They did not address evidence in the record that appears to undercut the conclusion that García-Cruz could reasonably relocate within Guatemala—for example, Garcia-Cruz’s testimony that he could not live with his wife in Salamá and does not “have a home ... [or] a job” there. Thus, neither the BIA nor the IJ “presented a reasoned analysis of the evidence as a whole.” Id. at 208 (quoting Jabri v. Holder, 675 F.3d.20, 24 (1st Cir. 2012)).
García-Cruz asserts that “every single factor” supports a conclusion that he cannot reasonably relocate, but he does little to develop this argument. He then asserts that the BIA’s “unfounded conclusion ... itself requires reversal.” That is not accurate. To reverse the BIA’s order, rather than simply remand it, the evidence must compel us to conclude that it would be unreasonable for García-Cruz to relocate within Guatemala. Id. at 207 (citing INS v. Elías-Zacarías, 502 U.S. 478, 481 n.1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). There is significant evidence in the record supporting a conclusion that relocation would be unreasonable. But García-Cruz has understandably focused on the BIA’s failure to properly analyze the reasonableness factors, rather than whether the evidence compels a finding that internal relocation would be unreasonable, and neither the IJ nor the BIA weighed the reasonableness factors. Given the limited analysis on this issue, we think it best to remand to the BIA to consider it fully. We therefore grant the petition for review, vacate the BIA’s order, and remand for further proceedings.[3]
CONCLUSION
Petition for review granted, order vacated, and case remanded for further proceedings.

. The U found Garcia-Cruz’s testimony credible, and the BIA did not make a contrary finding. We therefore summarize the facts as presented by García-Cruz in his testimony and affidavit.

. The BIA did not adopt the IJ’s findings (1) that it "could not conclude the requisite government action or inaction,” or (2) that Gar-cía-Cruz had not established a well-founded fear of future persecution even if he did not relocate within Guatemala. We therefore do not review those issues. Renaut v. Lynch, 791 F.3d 163, 170-71 (1st Cir. 2015); Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004) ("[W]here the BIA's decision adopts portions of the IJ’s opinion, we review those portions of the IJ’s opinion that the BIA has adopted.”).

. Because we vacate the BIA’s denial of Garcia-Cruz’s asylum petition, we do not reach Garcia-Cruz’s withholding of removal and CAT claims.